**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jose Luis Torres Rodriguez, | No. CV05-2092 PHX-DGC |
| Plaintiff, | |
| vs. | **ORDER** |
| City of Phoenix, et al., | |
| Defendants. | |

The parties in this civil rights case have filed partial, full, and cross motions for summary judgment. The Court has reviewed the memoranda and supporting materials submitted by all parties. Dkt. ##40-45, 47-48, 51-54, 57-58. For the reasons set forth below, the Court will deny Plaintiff's motions for partial and full summary judgment and grant Defendants' motions.

**I.     Factual Background.**[1]

Tragically, in 1998, five-year-old Ana Torres witnessed the murder of her mother, Kenia Cuellar, by Kenia's boyfriend, Daniel Cordova. Dkt. ##41 at ¶ 1; 45 at ¶ 2. Following the murder, Ana resided with her grandparents in Mesa, Arizona, but eventually was taken to Mexico by her grandmother, Rufina Cuellar. Dkt. ##41 at ¶ 2; 44 at ¶ 6. Plaintiff, who is Ana's natural father, obtained a temporary order in January of 1999 that granted him full

---

[1] Because all sides have filed motions for summary judgment, the Court has crafted this section from all three statements of fact. Most of the facts are undisputed. The Court will note where facts are disputed.

1    legal custody of Ana. He was unable to find Ana, however, after Rufina took her to Mexico.
2    Dkt. ##44 at ¶ 5; 45 at ¶ 2.

3          Plaintiff hired a private investigator, filed a report with the Mesa Police Department,
4    and spoke with Defendant E.G. Fragoso, who was investigating Kenia's murder. *Id*. at ¶ 3.
5    The parties differ on the exact number of times Plaintiff spoke with Fragoso and whether
6    Fragoso returned Plaintiff's phone calls, but the contact consisted, at most, of several
7    conversations between 1999 and 2001. *Id*. at ¶ 4. In the meantime, Ana was listed as a
8    missing child on the National Criminal Information Computer and Arizona Criminal
9    Information Computer ("NCIC/ACIC") databases (Dkt. #45 at ¶ 5) and Rufina was charged
10   with custodial interference. A warrant was issued for Rufina's arrest. Dkt. #44 at ¶ 6.

11         Fragoso arrested Daniel Cordova in Mexico approximately five years after the murder
12   and Cordova was charged with the murder of Kenia Cuellar. Dkt. #44 at ¶ 2. In preparing
13   to prosecute Cordova, Deputy Maricopa County Attorney Catherine Hughes realized that
14   Ana's testimony was necessary and asked Fragoso to locate her. *Id*. at ¶¶ 4, 7. Fragoso was
15   able to arrange a meeting between Hughes and Ana in Nogales, Mexico, in January 2004.
16   *Id*. at ¶ 8; Dkt. #41 at ¶ 6. At the meeting, which Fragoso attended, Hughes impressed upon
17   Ana's family the need to have Ana testify at Cordova's trial. Dkt. #44 at ¶ 10. The family
18   agreed that Ana would travel to Phoenix, accompanied by her uncle, Albert Cuellar. *Id*.
19   Hughes testified during her deposition in this case that there was an "implicit" promise that
20   Ana would be allowed to return to Mexico. Dkt. #45, Hughes Deposition at 23-24.

21         After the interview with Ana, Hughes asked Fragoso to contact Plaintiff. Dkt. #41 at
22   ¶ 7. Fragoso went to an address he had on file, but did not find Plaintiff there. *Id*. Fragoso
23   did not attempt to locate Plaintiff at the address listed on the 1999 custody order, where
24   Plaintiff was then living. Dkt. #45 at ¶ 6. Fragoso also attempted to contact Plaintiff by
25   phone, but Plaintiff had not provided Fragoso with a current telephone number. Dkt. #41 at
26   ¶ 4. Knowing that Plaintiff was a Mexican national, Fragoso contacted the United States
27   Office of Immigration and Customs Enforcement and learned that Plaintiff had been
28   apprehended at the border on October 25, 2003, while trying to enter the United States

1  illegally. Dkt. ##44 at ¶ 12; 41 at ¶ 7. As a result, Plaintiff had been issued a five-year ban
2  on returning to the United States. Dkt. #44 at ¶ 12. This information led Hughes to conclude
3  that Plaintiff no longer was in the United States. *Id*. at ¶ 13.

4        A month or two before trial, Hughes requested that Fragoso notify the Mesa Police
5  Department that Hughes and Fragoso had met with Ana in Mexico, that she appeared to be
6  in good health, and that she had agreed to travel to Phoenix to testify at Cordova's trial in
7  March 2004. *Id*. at ¶ 14, 15. Apparently based on this report, the Mesa Police Department
8  decided to remove Ana from the missing children databases. *Id*. at ¶ 16.

9        At the beginning of Cordova's trial, Hughes informed Judge William Wilkinson and
10 defense counsel that Ana was testifying voluntarily and may not appear. *Id*. at ¶ 17. Hughes
11 asked the trial judge if it was acceptable to allow Ana to come and testify without notifying
12 Child Protective Services, and the judge agreed that doing so would not breach any ethical
13 rules. Dkt. #44, Ex. 19. Hughes asked an investigator from her office to accompany Ana
14 and her uncle to Phoenix and made arrangements for Ana to stay in a hotel. Dkt. #45,
15 Hughes Deposition at 16.

16       On March 9, 2004, Ana came to the courthouse and testified against Cordova. Dkt.
17 #44 at ¶ 18. At the end of her testimony, the trial court excused Ana and she departed with
18 her uncle. *Id*. Plaintiff arrived at the courthouse a few days later, demanding to see his
19 daughter. Dkt. #45 at ¶ 7. Plaintiff apparently had been living in the United States despite
20 the five-year ban on his re-entry, and had learned of Ana's testimony from a newspaper
21 article. Dkt. ##45 at ¶ 7; 44 at ¶ 19. Fragoso talked to Plaintiff and directed him to ask
22 Hughes for information about his daughter. Dkt. #45 at ¶ 7. Around the same time, a friend
23 of Plaintiff's, Nancy Talamante, asked Hughes to intercede on Plaintiff's behalf. Dkt. #44
24 at ¶ 19. Hughes attempted to call Ana's uncle to tell him Plaintiff was looking for Ana. *Id*.
25 It is unclear whether she spoke to the uncle, but Hughes testified she did not hear from the
26 uncle again. *Id*. at ¶ 21.

27       Plaintiff filed this suit in July of 2005. He alleges that Defendants negligently
28 interfered with his custodial rights as a father and are liable under 42 U.S.C. § 1983 for

1 violating his constitutionally protected parental rights.  Dkt. #1.

2 **II.    Summary Judgment Standard.**

3 Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, "shows] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "Only disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Id*. at 248. Summary judgment may be entered against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

13 **III.   Analysis.**

14 **A.    Hughes' Absolute Immunity.**

15 "Prosecutors are generally immune from civil liability for actions taken in their official capacities." *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976).  "A prosecutor enjoys absolute immunity when he acts within the scope of his authority and in a quasi-judicial capacity." *Gobel v. Maricopa County*, 867 F.2d 1201, 1203 (9th Cir. 1989) (overruled on other grounds) (citations omitted).  Such "absolute immunity is warranted when the prosecutor acts as an advocate in initiating a prosecution and presenting the state's case." *Id*.  "Absolute prosecutorial immunity attaches to the actions of a prosecutor if those actions were performed as part of the prosecutor's preparation of his case, even if they can be characterized as 'investigative' or 'administrative.'" *Id*. at 1204 (citing *Demery v. Kupperman*, 735 F.2d 1139, 1143 (9th Cir. 1984)).

25 Hughes' actions clearly occurred in the preparation and prosecution of the case against Cordova.  Hughes did not contact Ana until after she was assigned to prosecute Cordova in 2003.  Dkt. #44, ¶ 4.  Hughes asked Fragoso to locate Ana as "a critical witness for a successful prosecution." *Id*. at ¶ 7.  After Fragoso located Ana, Hughes traveled to Mexico

1  to speak with Ana regarding her memory and the need for her to testify at trial as the only
2  witness to the murder. *Id.* at ¶¶ 8-10. She then arranged for Ana to testify at Cordova's trial.

3  This is not a case in which Hughes should be denied immunity for taking part in "the
4  preliminary gathering of evidence that may ripen into a potential prosecution." *Id.* Nor can
5  Hughes' actions be said to be "related to routine police activity, as opposed to judicial
6  activity." *Id.* Hughes' actions were entirely prosecutorial. *See, e.g.*, *Genzler v. Longanbach*,
7  410 F.3d 630, 641-43 (9th Cir. 2005) (discussing the difference between interviewing and
8  preparing a witness for trial, and police-like investigation prior to charges being filed);
9  *Joseph v. Patterson*, 795 F.2d 549, 555 (6th Cir. 1986) (same).

10  Citing the First Circuit case of *Suboh v. District Attorney's Office of the Suffolk
11  District*, 298 F.3d 81 (1st Cir. 2002), Plaintiff argues that Hughes lacks prosecutorial
12  immunity because she made a custody determination that was outside her authority as a
13  prosecutor. Dkt. #53 at 7. *Suboh*, however, addressed the question of qualified immunity,
14  not absolute immunity. 298 F.3d at 89-98. The First Circuit did note that the district court
15  in *Suboh* had denied the prosecutor absolute immunity because she made a custody
16  determination that was "wholly unrelated to any prosecutorial functions," but the court of
17  appeals expressed no opinion on the correctness of this conclusion. *Id.* at 89. Moreover,
18  even if this passing reference to the district court's decision were deemed a correct statement
19  of the law, it would not control this case. Unlike the prosecutor in *Suboh*, Hughes' actions
20  were entirely prosecutorial. Hughes therefore is entitled to absolute immunity and the Court
21  will grant summary judgment in her favor.

22  **B.   Plaintiff's Constitutional Claim.**[2]

23  Plaintiff asks the Court to find that Hughes and Fragoso violated his procedural and
24  substantive due process rights under the 14th Amendment by "knowingly returning Ana to
25  her kidnappers." Dkt. #42 at 1-2. Plaintiff relies solely on the First Circuit's decision in

---

27  [2]The Court will discuss Hughes' actions with respect to this claim even though she qualifies
    for absolute immunity. If her actions violated Plaintiff's constitutional rights, the Court must
28  address Plaintiff's § 1983 claim against her employer, Maricopa County.

- 5 -

1  *Suboh*.

2      *Suboh* involved a custody dispute between the mother of a child and the mother's
3  parents. Relying on fake documents to show they were the actual parents of the child, the
4  parents accused their daughter of kidnaping and sought the child's return. A detective
5  arrested the mother for kidnaping and took custody of the child. Despite being told by the
6  mother that she was the child's mother, that her parents' documents were forged, and that the
7  parents would take the child to Morocco if given the chance, and despite being provided
8  documents by the mother that confirmed these facts, the detective turned the child over to the
9  parents and they promptly fled with the child to Morocco. 298 F.3d at 87-88. The First
10 Circuit framed the constitutional issue very specifically: "[t]he constitutional right at issue
11 here is the right to procedural and substantive due process before the state takes a child away
12 from his or her parent." *Id*. at 93. The court found a possible constitutional violation
13 because the detective did not follow state procedures for terminating the mother's parental
14 rights, but instead "short-circuited all of these procedures by deciding the issue on his own."
15 *Id*. at 92.

16     Plaintiff suggests that this case presents the same constitutional violation because
17 Hughes and Fragoso "decid[ed] the dispute between Jose and Rufina over custody of Ana
18 by turning Ana back over to Rufina in Mexico after she testified." Dkt. #42 at 5. This
19 characterization warrants a closer look at the evidence.

20     Fragoso testified without dispute that his role in this matter consisted of locating Ana
21 in Mexico and accompanying Hughes to Mexico to interview Ana. After the interview,
22 Fragoso submitted a teletype that the Mesa Police Department used when removing Ana
23 from the NCIC/ACIC databases. Dkt. #45, Fragoso Deposition at 37. Fragoso had nothing
24 to do with Ana actually coming to Arizona for the trial. Dkt. #41, Ex. 13 at 23.

25     Hughes testified that she did not order Ana to testify, but rather requested that she
26 voluntarily travel to Phoenix. Dkt. #44 at ¶¶ 10, 17. At the end of the testimony, Ana left
27 the courthouse with her uncle. *Id*. at ¶ 18. Hughes testified that there was an implicit
28 promise made to Rufina that Ana would be allowed to return to Mexico. Dkt. #45, Hughes

1  Deposition at 23-24.  Hughes also assigned an investigator to accompany Ana and her uncle
2  to Phoenix and made arrangements for Ana to stay at a hotel.  *Id*. at pp. 16-17.  Finally,
3  Hughes requested that Ana be taken off the NCIC/ACIC databases so that she would not be
4  flagged crossing the border and thus delay Cordova's trial.  Dkt. #45, Hughes Deposition at
5  49-52.

6  Although these facts demonstrate that Fragoso and particularly Hughes had a role in
7  Ana's travel to the United States, and that both Fragoso and Hughes arguably prevented Ana
8  from being taken into custody by having her name removed from the NCIC/ACIC databases,
9  the facts remain fundamentally different from those in *Suboh*.  The detective in *Suboh*
10  arrested the mother, took physical custody of her child, and then turned the child over to the
11  mother's parents while having reason to know they were not the child's rightful custodians
12  and would leave immediately for Morocco.  The detective terminated the mother's parental
13  rights, and did so without any of the procedural protections afforded by state law and
14  guaranteed by the Constitution.

15  Hughes and Fragoso, in contrast, did not take Ana from Plaintiff's custody and
16  surrender her to Rufina.  They merely facilitated Ana's travel to Arizona to testify in the
17  prosecution of Cordova.  Plaintiff argues that Hughes and Fragoso effectively had custody
18  of Ana when they arranged for her travel, reserved a room for her in a hotel, and saw her in
19  court on the witness stand, but the Court does not agree.  Hughes did not subpoena Ana.
20  Fragoso did not arrest her or her uncle.  Ana's voluntary presence in court did not amount
21  to legal custody.

22  In effect, Plaintiff is arguing that Hughes and Fragoso *should* have taken Ana into
23  custody when they had the chance and that their failure to do so violated his constitutional
24  rights.  Citing *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 125 S.Ct. 2796 (2005),
25  Fragoso correctly contends that he had no such affirmative duty.  In *Castle Rock*, a woman's
26  daughters were killed by her ex-husband after he kidnaped them and the police failed to
27  enforce a restraining order against him.  *Id.* at 2802.  Although the restraining order stated
28  that the police "shall enforce" it, the Supreme Court found that the underlying state law did

1 not make enforcement of restraining orders mandatory. *Id.* at 2805. Even if enforcement had been mandatory, the Court explained, "that would not necessarily mean that state law gave [the mother] an *entitlement* to enforcement." *Id.* at 2808 (emphasis in original). The Court held that the mother did not have a property interest protected by the Due Process Clause in the enforcement of the restraining order. *Id.* at 2810.

In this case, the language of Plaintiff's custody order did not require police enforcement. *See* Dkt. #41, Ex. 2. Plaintiff has cited no Arizona law that gave him an entitlement to Fragoso's or Hughes' enforcement of the order. And Plaintiff has cited no legal authority suggesting that Fragoso and Hughes had an affirmative constitutional obligation to secure Ana for him.

While the Due Process Clause clearly protects certain interests, it protects them against state action. Due process "cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Deshaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 195 (1989). In the child custody context, at least one court has held that a state has "no affirmative duty to provide its citizens with protective services nor can the State be held liable for injuries that could have been averted had it chosen to provide them." *Van Loo v. Braun*, 940 F.Supp. 1390, 1398 (E.D.Wis. 1996).

The Court concludes that Defendants did not terminate Plaintiff's parental rights and had no affirmative duty to take Ana into custody and return her to Plaintiff. The Court therefore will grant summary judgment to Defendants on Count Two of Plaintiff's complaint.[3]

---

[3]In his § 1983 claim against the City of Phoenix and Maricopa County, Plaintiff claims that they "maintain policies or practice of deliberate indifference to and/or have failed to properly train its police officers . . . not to aid and abet in kidnaping to prosecute a criminal case." Dkt. #1. To prevail on this claim, Plaintiff must show that (1) he was deprived of a constitutional right by the government, (2) the government had customs or policies that amounted to deliberate indifference, and (3) these policies were the moving force behind the constitutional deprivation. *Berry v. Baca*, 379 F.3d 764, 767 (9th Cir. 2004). Because the

**C.    State Law Claims.**

Plaintiff alleges in Count One that "Defendants were grossly negligent and/or negligent in failing to notify Plaintiff that his child was coming into the United States from Mexico to testify, failing to arrest those who had kidnaped Ana upon their entry into the United States (Arizona) and in failing to return her to her father." Dkt. #1. Plaintiff claims that "Defendants owed Plaintiff a duty to obey the custody orders, not to knowingly interfere with the custody of Ana and not to knowingly aid and abet those who kidnaped his daughter." *Id*.

**1.    Negligence.**

To be liable for negligence, a defendant must have a duty to protect others from unreasonable risks of harm. *Markowitz v. Arizona Parks, Bd.*, 706 P.2d 364, 366 (Ariz. 1985). Absent a special relationship, there is no duty to protect others. *See Collette v. Tolleson Unified School Dist.*, 54 P.3d 828, 832 (Ariz. App. 2002) (citing Restatement (Second) of Torts § 314 (1977)).

Plaintiff has provided no evidence of any special relationship with Defendants. Hughes had no duty to enforce a custody order that was unrelated to the criminal case she was prosecuting. Fragoso did not develop a special relationship with Plaintiff merely by speaking with him a few times years before the trial. With no duty owed to Plaintiff by Hughes or Fragoso, the claim for negligence cannot stand. The lack of duty also defeats Plaintiff's gross negligence claim.

Plaintiff again relies on *Suboh*, arguing that "[w]e are not dealing with failure to protect other [sic] from harm[.] We are dealing with harm caused by the direct actions taken by Defendants[.]" Dkt. #53 at 7. Plaintiff's discussion of harm does not save his negligence claims, however, because Defendants owed him no duty. Moreover, as discussed in Section

---

Court has concluded that Defendants did not violate Plaintiff's constitutional rights, the Court will grant summary judgment to the City and Maricopa County on this claim. Additionally, because the Court finds no constitutional violation, it need not address whether Fragoso is entitled to qualified immunity.

III(B) above, no direct actions of Defendants caused Plaintiff harm.[4]

### 2. Custodial Interference.

The tort of custodial interference has not been recognized in Arizona. Plaintiff correctly notes, however, that Arizona courts follow the Restatement. Dkt. #53 at 8 (citing *Wilson v. United States Elevator Corp.*, 972 P.2d 235, 239 (Ariz. App. 1998)). The Restatement (Second) of Torts defines custodial interference as follows:

> One who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent.

Restatement (Second) of Torts § 700 (1977)). This is an intentional tort. *See, e.g.*, *Hoblyn v. Johnson*, 55 P.3d 1219, 1225 (Wyo. 2002); *Sager v. Rochester General Hospital*, 647 N.Y.S.2d 408, 411 (Sup. Ct. 1996).

In this case, Defendants did not abduct or otherwise compel or induce Ana to leave Plaintiff, nor did they fail to return her to Plaintiff after Plaintiff had intrusted her to their care. Nor has Plaintiff presented evidence that Defendants intentionally and wilfully interfered with his parental rights. *Sager*, 647 N.Y.S.2d at 411. At most, Defendants failed to obtain custody of Ana on Plaintiff's behalf when they had the chance. This conduct does not fall within the plain meaning of Restatement § 700.[5]

**IT IS ORDERED:**

1. Plaintiff's motion for partial summary judgment (Dkt. #42) is **denied**.

---

[4] Plaintiff has made claims against the City of Phoenix and Maricopa County for negligent hiring and retention of Fragoso and Hughes. Because the Court concludes that Fragoso and Hughes did not act negligently or otherwise cause injury to Plaintiff, the City and Maricopa County are entitled to summary judgment. Any negligence on their part did not result in harm to Plaintiff.

[5] The Court feels compelled to note that Plaintiff's motion and joint response include more than 80 typographical errors in 15 pages of text. Dkt. ##42, 53. In addition, there is a general lack of accuracy in all parties' statements of fact. Citations often do not fully support assertions in the statements of fact. The parties should exercise greater care in future filings with the Court.

2. Plaintiff's cross-motion for summary judgment (Dkt. #53) is **denied**.
3. Defendants' Eleterio Fragoso and City of Phoenix's motion for summary judgment (Dkt. #40) is **granted**.
4. Defendants' Catherine Hughes and Maricopa County's motion for summary judgment (Dkt. #43) is **granted**.
5. Plaintiff's motion for extension of time (Dkt. #46) is **granted**.
6. The Clerk of the Court is directed to terminate this action.

DATED this 5th day of February, 2007.

*David G. Campbell*
United States District Judge